**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ROLANDO AGUALLO,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **No. 12 C 48** |
| | ) | |
| **MICHAEL P. ATCHISON,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

In July 2002, an Illinois jury convicted Rolando Aguallo of three counts of

aggravated battery with a firearm in connection with the shooting of a man and two

women on a Chicago street in July 1998. His sentence is three consecutive thirty-year

prison terms. The Illinois Appellate Court affirmed Aguallo's conviction on direct appeal,

and, after the Illinois Supreme Court denied his petition for leave to appeal, he filed a

petition for post-conviction relief. The Circuit Court of Cook County denied his petition,

and the Appellate Court affirmed the decision.

Aguallo has now petitioned this Court for a writ of habeas corpus pursuant to

28 U.S.C. § 2254. Respondent Michael Atchison, the warden of the prison where

Aguallo is incarcerated, argues that two of the claims, and part of a third, are

procedurally defaulted, and that the remaining claims are without merit, because state

courts decided them reasonably under section 2254. In his reply, Aguallo contends that

none of his claims is defaulted and that the state courts wrongly decided the claims he

1

asserted on direct appeal and on post-conviction review.  For the following reasons, the Court denies Aguallo's petition.

## Background

### A.    Trial court proceedings

On the night of July 21, 1998, three people were shot in the area of 32nd Street and Morgan Street in Chicago.  Sergio Pineda was shot in his leg; Ignatia Ochoa was shot in her upper right arm and on her right side; and Donna Dixon was shot in the buttocks.  None died as a result of the shooting.

Police arrested Rolando Aguallo on the same night as the shootings.  In June 2000, Aguallo filed a motion to suppress the statement he gave to police while in custody after the shootings.  In the motion, he argued that he was "coerced into giving a statement implicating himself" and that his statements were "involuntarily induced," based on the length of his detention and unspecified promises he claimed were made to him.  Ex. Q at 59.  After a hearing, the circuit court denied Aguallo's motion in March 2001.  In an oral ruling, the court stated that "[t]here is not a scintilla of evidence that any coercion was made by the police, neither is there any scintilla of evidence that he was deceived by the police in any way whatsoever."  Ex. M at 120.  The court considered the duration of the interrogation (as opposed to the time Aguallo spent in the interrogation room), the fact that Aguallo was fed, and could rest on a bench in the room.  It concluded that "the defendant's statement was freely and voluntarily made and his will was not overborne."  *Id.* at 121.

Aguallo's trial began on July 29, 2002.  The prosecution first called Chicago police detective John Murray, who responded to the scene of the shooting in July 1998.

Murray reported that ambulances were tending to the three victims when he arrived and that he noted a car struck by a bullet on Morgan Street and a "large pool of blood" on a nearby doorstep. Ex. O at 19. Murray testified that he then learned about a witness, Dominga Martinez, who had been taken to a nearby police station to give a statement. Following the interview with Martinez, Murray said, the police began to search for Aguallo.

Murray also discussed his questioning of Aguallo in an interview room at another police station, where he said he advised Aguallo of his *Miranda* rights. Murray testified that Aguallo told him he was a member of a gang called the Satan Disciples, which was at war with another gang, the Latin Kings. *Id.* at 24. Aguallo told Murray that on the night of the shootings, he was first drinking with a friend and then went to his girlfriend's home, and he had no knowledge of the shootings. Murray and other police then sought unsuccessfully to find and interview the individuals Aguallo had mentioned. When Murray returned to work the next day at 4 p.m., he brought Aguallo food from McDonald's. Later that day, Murray interviewed Aguallo's girlfriend's mother, who reported that Aguallo was not with the girlfriend the previous evening. Murray told Aguallo about that interview, after which Aguallo told him a different story about the shooting. Aguallo said that he was in his neighborhood when he saw men in a car who "flashed him the crown"—the gang sign of the Latin Kings. *Id.* at 34. Following that, Aguallo said, he retrieved his gun from a nearby awning, ran to Morgan Street, and began firing the gun at the car and a group of people he thought were Latin Kings standing on the street.

On cross-examination, Murray testified that Aguallo stayed in the interview room for sixteen or seventeen hours before he first ate something (the McDonald's meal). Aguallo ate again about seven hours later, when Murray brought him at least one hamburger, fries, and a Coke from Checker's. Altogether, Murray testified, Aguallo was in the interview room for twenty-four to twenty-five hours. During his time in that room, Murray said, Aguallo did not ask for an attorney or to make a phone call.

Later, after the prosecution called the victims in the case to testify about their injuries, it questioned Assistant State's Attorney Paul Quinn, who wrote out the statement that Aguallo signed in the interview room. Quinn testified that he also gave Aguallo *Miranda* warnings, after which Aguallo said he was willing to talk about the shootings. Aguallo proceeded to implicate himself, Quinn said, and Quinn wrote out Aguallo's statement to that effect, with Aguallo "free to make any corrections or deletions." *Id.* at 191. "Once in a while I'd ask him what happened next to clear up a point, but it was basically me sitting next to him writing word for word as I talked with him," Quinn testified. *Id.* at 193. Quinn said that Aguallo initialed any corrections that Quinn made, and that Aguallo signed each page of the completed statement to note his approval. It included a statement that Aguallo "is giving this statement freely and voluntarily and that no threats or promises have been made in exchange for this statement" and that he speaks English and understood the statement. *Id.* at 199–201.

The prosecution also called Chicago police officer George Heidmann to testify. Heidmann testified that he received a call on the night of July 21, 1998 and went to 33rd and Morgan, where he encountered the shooting victims. He further testified that he recovered spent nine-millimeter shell casings from the area and interviewed Martinez on

the scene. Heidmann testified that Martinez gave him Aguallo's name and description, which he sent out to other police cars in the area. "I believe she identified him by his first name," Heidmann testified. Ex. O at 146. The following witness, a forensic scientist from the Illinois State Police, testified that no acceptable latent fingerprints were found on the discharged bullet casings in the case. Another forensic worker testified that all bullets recovered from the shooting came from the same gun.

The prosecution also called Dominga Martinez, who testified she was in front of her house near Morgan Street at the time of the shooting in July 1998. Martinez testified that before the shooting, she was "going to the store with my girlfriends first," two individuals named "Judy and Rosella." *Id.* at 87. At around 9:30 or 9:40 p.m. that night, Martinez was outside her house on 32nd Street near Morgan Street when she saw "two guys running from around the corner" who "stood right on the corner by my house," one of whom started firing a gun. *Id.* at 72. Martinez testified that one of the men said the words "disciple love," and the other said "king killer, king killer." *Id.* at 73. She told the jury that she could see "the face of the man with the gun" in the lights of a nearby bank, and she identified the shooter as Aguallo. *Id.* at 74–75. Martinez said she knew Aguallo for ten years from her time as a volunteer at a local youth center and that she told the first police officers to arrive on the scene what she had seen. She then testified that she had again identified Aguallo when the police "put a spotlight on him and asked me if it was him and I told them yes it was." *Id.* at 78. Aguallo was the only person whom police showed to Martinez. Later, defense counsel asked Martinez if she had told two people named Monica Marshall and Sharon Edwards that Aguallo did not commit the shooting, and Martinez said no.

After the lunch break on the first day of Aguallo's trial, one of the prosecutors informed the court out of the presence of the jury that Martinez had just spoken to her mother, who reported that Aguallo's brother had called to threaten Martinez's two sons if she proceeded with her testimony. When Martinez returned to the witness stand, the prosecutor, with the court's permission and in the presence of the jury, asked Martinez was she was crying. Martinez testified that her mother had just paged her and that Satan Disciples had tried to get her to change her story on the witness stand. After the prosecutor inquired into how they had done so, defense counsel objected, and the court sustained the objection and cut off further inquiry. Elsewhere during her testimony, Martinez said that she was "not really good" with the directions north, south, east, and west. *Id.* at 116. On re-cross examination, Martinez said she "wasn't far at all" from Aguallo when he fired shots, perhaps the same distance as that from the witness stand to the back of the courtroom. *Id.* at 119. The court at that point interjected and told counsel that the distance noted was "[a]pproximately 80 feet." *Id.*

The defense's first witness was Martha Aguallo-Flores, Aguallo's sister. Aguallo-Flores testified that Aguallo could not read much or any English in 1998, though she said he did understand her when she spoke English while teaching him how to read. She further testified on cross-examination that she had not told police officers in the four years after her brother was arrested that he had limited understanding of English.

Aguallo also called three witnesses who each testified that Dominga Martinez had told them that she lied when naming Aguallo as the shooter to police. Sharon Edwards testified that Martinez told her in July 1999 "that she knows that Rolando didn't do it, that she was just going to point out anybody that the police brought down to her

because her kids were out there." Ex. P at 30. Edwards further testified that Martinez told her that "Little Richard's cousin" was the shooter, not Aguallo. *Id.* On cross-examination, the prosecutor asked Edwards whether she had informed various authorities or news media outlets about Martinez's admission to her; Edwards said no. Defense counsel did not object to this line of questioning. A similar colloquy occurred during the testimony of Edwards's fiancée, Michael Sparacino, who testified that he heard the same statement by Martinez about Aguallo not being the shooter. When the prosecutor asked Sparacino whether he had called the FBI after hearing Martinez's statement to tell them, "You have got to investigate these guys," defense counsel objected; the objection was overruled. *Id.* at 40. Defense counsel otherwise did not object when the prosecutor asked Sparacino if he had called various authorities and news outlets with the news of Martinez's statement. (Sparacino had not.) Next, defense counsel called Monica Marshall, who testified that she was playing basketball with Aguallo several blocks from the shooting when it occurred. As with prior witnesses, the prosecutor asked Marshall whether she had reported this exculpatory information to authorities or the news media; Marshall had not. Marshall also testified that she was living with Martinez in July 2000 when Martinez told her that Aguallo "didn't do it, that she was just blaming it on him because she didn't like none of the guys from the projects." *Id.* at 49. The defense called no other witnesses.

In his closing argument, Aguallo's defense counsel argued that Aguallo's confession had been coerced. Counsel noted the length and conditions of Aguallo's stay in the interview room at the police station, including the bare bench provided for rest, as well as the "16 or 17 hours" that elapsed before Aguallo was fed. Ex. P at 82–

84.  He further discussed Aguallo's "trouble reading" and seventh-grade education,

along with the fact that the statement Quinn produced had only one correction.  *Id.* at

89–90.  "After 25 hours, I suspect someone would sign almost anything," defense

counsel said.  *Id.* at 90.

In his rebuttal, the prosecutor addressed the argument that Aguallo's confession

was involuntarily given.  After criticizing the argument, he said, "Folks, you are here to

decide issues of fact, whether or not that statement was coerced as an issue of law, and

that has been decided, and you have heard about it."  Ex. P at 113.  Defense counsel

objected to the statement, but the court overruled the objection.  The prosecutor

proceeded to tell the jury that "if that statement was coerced, if it was unconstitutionally

taken, you wouldn't have heard about it.  We would have rested on the one big piece of

evidence we had, Dominga Martinez."  *Id.*  Later, in giving jury instructions, the court

told the jury that the court sometimes "rule[s] on the admissibility of evidence," and that

the jurors "should not concern yourselves with the reasons for these rulings."  *Id.* at 115.

The jury found Aguallo guilty of each of the three charges of aggravated battery

with a firearm.  Aguallo filed a timely motion for a new trial, in which he argued six

issues.  These were: (1) his motion to suppress his confession should have been

granted given the length of his interrogation; (2) his motion *in limine* on references to the

term "gang" should have been granted; (3) his objection to unspecified jury instructions

should have been sustained; (4) the prosecution's failure to prove his guilt beyond a

reasonable doubt; (5) the evidence at trial did not exclude every reasonable hypothesis

consistent with his innocence; and (6) the prosecution did not prove that he committed

aggravated battery with a firearm.  Ex. Q at 106–07.  The circuit court denied the motion

at the start of Aguallo's sentencing hearing on August 30, 2002. It proceeded to sentence him to three consecutive terms of thirty years.

**B.      Appeal and post-conviction proceedings**

On direct appeal, Aguallo argued four issues. First, he claimed he was denied a fair trial because of the prosecutor's reference to the judge's decision not to suppress the confession and because the prosecutor impeached three of the defense witnesses with their prior silence. His other three claims concerned the length and consecutive nature of his three thirty-year sentences. The Illinois Appellate Court overruled Aguallo's fair trial claims. It first observed that Aguallo's motion for a new trial "did not include the issue of improper impeachment of Edwards, Sparacino, and Marshall or the issue of improper closing argument by the [prosecutor]." Ex. A at 13. The court then pointed out that a failure to preserve an issue in a trial objection and in a post-trial motion waives the issue on appeal. The court proceeded to evaluate both issues for plain error. On the issue of improper impeachment, the court pointed to Illinois law holding that evidence of prior silence is admissible to impeach witnesses, and that the witnesses in question had "months or even years to" provide exculpatory evidence about Aguallo to authorities. *Id.* at 15–17. The court held that the trial court's allowance of this impeachment was not an abuse of discretion, as "there was no error, much less plain error." *Id.* at 17.

On the prosecutorial comments issue, the court first cited Illinois law that reversal of a verdict is proper only when a prosecutor's remarks are improper and prejudice the defendant and that prosecutors have wide latitude in the content of their closing arguments. In this case, the court said, "[t]he State did not rest its case, either

evidentiary or argumentative, regarding defendant's statements on a bare assertion that the issue was already decided as a matter of law." *Id.* at 18–19. Furthermore, the prosecutor's comment was true, the court reasoned, because if Aguallo's statement was unconstitutionally acquired, it would have been suppressed. But "[m]ost importantly," the court said, the jury instructions warned jurors that the closing arguments were not evidence. *Id.* at 19. "Any implication in the ASA's closing argument that the jury was required to accept defendant's statement at face value was cured by a jury instruction unequivocally informing the jury that the weight of defendant's statements was their decision in light of all the circumstances surrounding the statement." *Id.* at 19. The appellate court therefore held that the prosecutor's comments had not prejudiced Aguallo. It affirmed his convictions but vacated his sentences and remanded his case for further consideration of the nature of the victims' injuries under 730 ILCS 5/5-8-4(a), an issue Aguallo does not raise here.

Less than one month after his direct appeal decision, Aguallo filed a petition for leave to appeal (PLA) to the Illinois Supreme Court. He presented three issues. He again claimed his trial was unfair because of the prosecutor's improper closing argument and improper impeachment of the defense witnesses with their silence. He also claimed his ninety-year sentence was excessive. The Illinois Supreme Court denied Aguallo's PLA in October 2004. In July 2005, the trial court found that the harm to the victims in the case constituted severe bodily injury and ruled that Aguallo's three thirty-year sentences were to be served consecutively under 730 ILCS 5/5-8-4. The Appellate Court affirmed this decision in August 2007.

In January 2006, while his appeal following the remand of his sentencing issue was pending, Aguallo filed a petition for post-conviction relief in the Circuit Court of Cook County. He asserted claims of ineffective assistance of counsel at trial, violation of his Fifth and Fourteenth Amendment rights by the trial court's admission of Martinez's testimony about gang intimidation, and ineffective assistance of appellate counsel for failing to raise this issue on direct appeal.

The circuit court ordered a hearing on the ineffective assistance of trial counsel claim. At the hearing, Aguallo's post-conviction counsel presented evidence regarding Aguallo's waiver of *Miranda* rights and trial counsel's failure to investigate and call certain witnesses. Post-conviction counsel called several witnesses, among them three members of the Zawadzki family, who lived near the scene of the shooting when it took place, as well as Aguallo's trial counsel James Marcus, investigator Robert Swanson, Dominga Martinez, and Aguallo himself.

Judy Zawadzki and her daughter Rosellen, who lived near the scene of the shooting when it took place, testified that they were not with Martinez before the shooting, as Martinez had claimed at trial. They said instead that they were inside their respective homes. Judy Zawadzki testified that she came outside after hearing the shots and heard Martinez shout, "Oh, I seen it. I seen it," and tell the police she could identify the shooter. Ex. V at 23. She further testified that Martinez was yelling that someone named "KK" did the shooting, and that "KK" referred to "King Killer." *Id.* at 24–25. Rosellen Zawadzki testified that she did not hear the shots from inside her home when they were fired but that she went outside afterward and saw Martinez speaking to police officers. She said she had not been with Martinez prior to that time. Tanya

Zawadzki testified that she was outside her house on Morgan Street when the shots were fired in her direction.  She saw "a man coming to shoot" outside a store at 33rd and Morgan, one block south, stipulated to be eighty feet away from her.  *Id.* at 27.  She further testified that she could not identify the shooter, because it was "too dark," and that there was "[m]aybe a fence" obstructing her view.  *Id.* at 26–29, 32.

The hearing also included testimony from James Marcus, Aguallo's trial attorney, and Robert Swanson, an investigator hired by Aguallo's post-conviction counsel. Marcus testified that he "did make some attempt" to locate Judy and Rosellen Zawadzki, "although not much of an attempt," because he feared that additional eyewitnesses could corroborate Martinez's account of the shooting.  *Id.* at 75–76.  In addition, he stated that he could not locate Martinez before trial and that he had gone to 32nd and Morgan with a camera to "take some pictures" and "observe[ ] the scene where the alleged incident occurred."  *Id.* at 79.  Marcus added that he did not use the photographs at trial because "[t]hey weren't particularly helpful," and "[t]he State had taken numerous pictures in a closer period of time to the incident."  *Id.* at 80.  Marcus also testified that he believed Aguallo always communicated with him in English, understood English at the time of the shooting, and understood the *Miranda* warnings the police gave him.  Finally, Marcus testified that Aguallo had told him that he did not want to testify at trial.

Swanson told the court about his investigation of the case, including his visit to Morgan Street, where he made various measurements and could not see 32nd Street east of Morgan or Lituanica Avenue from Martinez's then-residence.  Specifically, he testified that he measured 210 feet from the residence he was told belonged to

Dominga Martinez at the time of the shooting to the east sidewalk of Morgan Street. He also measured from a nearby alley to Morgan Street, for a total of about 183 feet. On cross-examination, Swanson testified that he did not measure from the Martinez residence to the northeast corner of 32nd and Morgan.

Aguallo also testified at the hearing. He told the court his English skills were limited at the time of the shooting incident, and he discussed the show-up proceeding and his questioning by Chicago police. Aguallo testified that he never orally admitted to the shooting but signed a handwritten statement to that effect, which he was "rushed" into doing. *Id.* at 125. He further told the court that he had informed Marcus that he wanted to testify but that Marcus would not allow it, because the testimony could result in the prosecution using his criminal record against him.

Dominga Martinez also testified. She told the court she did not recall much of her testimony at Aguallo's trial, including what she testified to, the Zawadzkis' last name, whether detectives interviewed her after the shooting, and what she saw on the night of the shooting. She also testified that Swanson had interviewed her, but she could not recall what she told him, including whether she had recanted her testimony to Swanson. (She did recall that she did not read or sign a statement attributed to her that Swanson had written up.)

Swanson was then recalled to the witness stand and testified that Martinez did discuss the shooting with him. He said Martinez told him that she saw the shooting but could not identify the shooter. She would not, however, sign a statement Swanson had prepared indicating she did not know who the shooter was, though she verbally verified the statement's contents. On cross-examination, Swanson testified that he had in fact

prepared two handwritten statements after speaking to Martinez. On one copy, Swanson had added the line, "I could not identify him," on direction from Aguallo's attorney, and showed that copy to Martinez. *Id.* at 195.

The circuit court denied Aguallo's post-conviction petition. It held that Marcus's actions amounted to trial strategy, not ineffective assistance, as his strategy was to present an alibi and present witnesses to testify that Martinez told them she lied on the stand. In March 2011, the Illinois Appellate Court affirmed the circuit court's decision. Following that decision, Aguallo filed a PLA with the Illinois Supreme Court, which that court denied in May 2011.

## C.  Aguallo's habeas corpus petition

Aguallo has filed a *pro se* habeas corpus petition in this Court, asserting four claims. First, Aguallo argues that his right to a fair trial was denied when the prosecutor at his trial "falsely suggest[ed] to the jurors that the trial judge had already ruled on the voluntariness of petitioner's inculpatory statement." Pet. at 5. Second, he contends that his rights to a fair trial and due process were denied when "the prosecutor improperly impeached three (3) key witnesses with their prior silence without establishing that they had an opportunity or a reason to contact authorities." *Id.* Third, Aguallo asserts a claim of ineffective assistance of counsel at trial on multiple grounds, including that the errors of his trial counsel cumulatively constituted ineffective assistance. Finally, Aguallo contends that his counsel on direct appeal was ineffective, because the attorney "failed to raise the meritorious claim that the state's sole witness was allowed to testify that unidentified individuals threatened her." Pet. at 6.

In its answer, respondent argues that Aguallo has procedurally defaulted his two fair trial/due process claims and that he cannot show cause for and prejudice from the defaults or that denying his claims would effect a miscarriage of justice. Respondent also contends that two of Aguallo's ineffective assistance of trial counsel claims are defaulted, or else barred under section 2254(d), as previous state court decisions on those issues were reasonable applications of clearly established federal law.

## Discussion

A petitioner is entitled to a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A federal court may issue a writ of habeas corpus on a claim that was adjudicated on the merits in state court proceedings only if the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d); *Newman v. Harrington*, 726 F.3d 921, 927 (7th Cir. 2013).

### A.    Fair trial / due process claims

Aguallo's two fair trial / due process claims concern the prosecutor's actions at trial: his comments during closing argument that the trial judge had already decided that Aguallo's statement to police had not been coerced, and his impeachment of Aguallo's defense witnesses with their prior silence. Both Aguallo and respondent group these claims together, and the Court will discuss them together as well.

### 1.    Procedural default

Respondent argues that both of Aguallo's trial error claims are procedurally defaulted because he did not raise them in his post-trial motion and the state appellate court concluded they had been waived.  Aguallo contends otherwise.  He argues that respondent's cited cases are inapposite—though he does not address all the cases respondent cites—and further contends that his claims are not defaulted because the Illinois Appellate Court in fact decided the claims on their merits.  Repl. at 5.

A federal court considering a habeas corpus petition may "not take up a question of federal law presented in [the] case if the decision of [the state] court rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment."  *Lee v. Kemna*, 534 U.S. 362, 375 (2002) (internal quotation marks omitted). Such a ground "may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits."  *Walker v. Martin*, 131 S. Ct. 1120, 1127 (2011).  The Seventh Circuit has held that "there is no dispute as to the independence of the ground" if the Illinois Appellate Court disposed of a claim because a habeas corpus petitioner failed "to include any and all claims of error in a post-trial motion for a new trial."  *Miranda v. Leibach*, 394 F.3d 984, 992 (7th Cir. 2005) (citing 725 ILCS 5/116-1; *People v. Enoch*, 122 Ill. 2d 176, 522 N.E. 2d 1124, 1129–30 (1988)).

Aguallo does not deny that he failed to include either the prosecutor's improper closing argument or impeachment of trial witnesses as issues in his motion for a new trial.  He contends, however, that there was not an independent and adequate state ground for the decision in his case because the Illinois Appellate Court actually decided

these two issues on the merits, thus opening them for review by this Court. He argues that "Illinois allows for an exception to get around waiver through plain error review." Repl. at 4, citing *Smith v. Stewart*, 241 F.3d 1191, 1196 (9th Cir. 2001), *rev'd*, 536 U.S. 856 (2002).

Aguallo does not specify the statement upon which he relies from *Smith*, a decision the Supreme Court reversed in 2002. The Court assumes he intended to refer to the case's reference to the rule, also followed in the Seventh Circuit, that an independent and adequate state ground for a decision does not exist if the state court's procedural ruling is "intertwined with its analysis of the merits" of a constitutional claim. *Smith*, 241 F.3d at 1196; *see also, e.g.*, *Moore v. Bryant*, 295 F.3d 771, 774–5 (7th Cir. 2002) (no independent and adequate state ground in habeas case when Illinois court analyzed both waiver and merits of a claim, "and does not clearly and expressly rely on the procedural default").

Aguallo is correct to observe that Illinois appellate courts often undertake "plain error" review of constitutional claims. "Illinois like many states provides a safety valve for situations in which enforcing a procedural default would mask a plain error." *Neal v. Gramley*, 99 F.3d 841, 844 (7th Cir. 1996) (citing *People v. Herrett*, 137 Ill. 2d 195, 561 N.E.2d 1, 7–8 (1990)). Yet plain error review of an issue does not, as a general rule, constitute consideration of that issue on the merits for purposes of habeas corpus review. The Seventh Circuit has "repeatedly explained that where a state court reviews the claim for plain error as the result of a state procedural bar such as the Illinois doctrine of waiver, that limited review does not constitute a decision on the merits." *Gray v. Hardy*, 598 F.3d 324, 329 (7th Cir. 2010); *see also Thomas v. Gilmore*,

144 F.3d 513, 518 (7th Cir. 1998) ("[R]eview for plain error does not cure a procedural default.").  Cases like *Moore* are distinguishable, as they do not involve situations in which the state court undertook plain error review.

The appellate court's language in Aguallo's case was not a model of clarity.  But upon examination, it is apparent that the court first determined that Aguallo waived consideration of the issues and then proceeded to resolve whether the trial court's rulings that he challenged on appeal amounted to plain error.  After noting that Aguallo did not include either of the issues under discussion in his motion for a new trial, the court stated that such issues are waived on appeal "unless the issue was preserved in an objection at trial and in a post-trial motion."  Ex. A at 15.  The court then discussed the purpose and standard for the plain error doctrine, noting that it "allows courts to review an otherwise-waived issue if the evidence was closely balanced or the error was of such magnitude that it deprived defendant of a fair trial."  *Id.*  The court first determined that the trial court did not abuse its discretion in allowing the prosecutor at trial to impeach Edwards, Sparacino, and Marshall with their silence, holding that "there was no error, much less plain error."  *Id.* at 17.  It then decided that there was no reversible error in the trial court's allowing the prosecutor's allegedly improper closing argument.  *Id.* at 19.  Given the court's initial conclusion that Aguallo had waived the issues for purposes of appellate review, the court's consideration of these points did not constitute merits review of Aguallo's trial error claims.  "[W]here a state court reviews a federal constitutional claim for plain error because of a state procedural bar (here, the doctrine of waiver), that limited review does not constitute a decision on the merits."

*Kaczmarek v. Rednour*, 627 F.3d 586, 592 (7th Cir. 2010).  The Court concludes that Aguallo's two claims of trial error are procedurally defaulted.

### 2.      Cause and prejudice

Aguallo argues that any procedural default of his claims of trial error should be excused.  A court may consider a defaulted claim on its merits if the habeas corpus petitioner can demonstrate cause for the default and prejudice resulting from the error. *House v. Bell*, 547 U.S. 518, 536 (2006).

In this case, the default first occurred when defense counsel failed to include both issues—the prosecutor's improper impeachment, and improper statements in his rebuttal—in Aguallo's motion for a new trial.  Aguallo's appellate counsel then failed to argue trial counsel's ineffectiveness for not raising these issues.  Then, on post-conviction review, Aguallo's counsel raised the issue of his appellate counsel's ineffectiveness—but not for his failure to raise either of these trial error issues.  Aguallo now argues that his post-conviction attorney should have asserted a claim of ineffective assistance of appellate counsel for failure to argue trial counsel's ineffectiveness, and that his failure should excuse his trial counsel's earlier default.

It is true that "in certain circumstances counsel's ineffectiveness in failing properly to preserve the claim for review in state court will suffice" to demonstrate cause for a default.  *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).  However, "a claim of ineffectiveness must itself have been fairly presented to the state courts before it can establish cause for a procedural default of another claim."  *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004) (citing *Edwards*, 529 U.S. at 452–54).  In other words, an attorney's "alleged ineffectiveness cannot excuse the default" if the claim of

ineffectiveness is itself defaulted. *Id.* In addition, habeas corpus petitioners are generally not permitted to argue ineffective assistance of counsel arising from an attorney's action or inaction in post-conviction proceedings. *See Coleman v. Thompson*, 501 U.S. 722, 752 (1991).

Aguallo contends that the attorney who handled his post-conviction petition in state court was deficient for neglecting to include an ineffective assistance of counsel claim, in which Aguallo could have alleged that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness. He argues that "[p]ost-conviction counsel's failure to present the claim of appellate counsel's ineffectiveness for not raising the further issue of trial counsel's ineffectiveness for not preserving claims one (1) and two (2) in the post-trial motion can constitute 'cause.'" Repl. at 7. He contends that "[t]he ineffectiveness of post-conviction counsel can sometimes excuse the default of a substantial claim that trial counsel was ineffective." Repl. at 6 (citing *Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012)).

In *Martinez*, the Supreme Court modified the rule from *Coleman* by creating a "narrow exception." *Id.* at 1315. The Court held that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.* The Court stated, however, that the exception applies only in cases where the "collateral proceeding is the first designated proceeding for a prisoner to raise a claim of ineffective assistance at trial," as was the case with Arizona law in *Martinez*. *Id.* at 1317.

The Supreme Court elaborated on this exception in *Trevino v. Thaler*, 133 S. Ct. 1911 (2013). Texas law permits defendants to raise ineffective assistance of trial

counsel claims on direct appeal.  In that state, however, state procedural rules made it "virtually impossible for appellate counsel to adequately present an ineffective assistance [of trial counsel] claim on direct review.  *Id.* at 1918 (internal quotation marks omitted).  These rules deny defendants "meaningful review" of such ineffective assistance claims, and in response, "Texas courts in effect have directed defendants to raise claims of ineffective assistance of trial counsel on collateral, rather than on direct, review."  *Id.* at 1919.  Therefore, in Texas, the Court held, a procedural default does not bar a petitioner from bringing a claim of ineffective assistance of counsel at trial if post-conviction counsel at the initial collateral proceeding was ineffective.  *Id.* at 1921.

There are certainly some situations in Illinois in which a claim of ineffective assistance of trial counsel cannot be made on direct appeal—for example, when the evidence that forms the basis for the ineffective claim appears nowhere in the trial record.  But this is not such a case.  The claims of ineffective assistance of trial counsel that Aguallo's appellate counsel failed to make were claims that easily could have been made on appeal, because the basis for the claimed ineffective assistance—trial counsel's failure to assert the two trial error claims in a post-trial motion—was already a matter of record.  For this reason, the "narrow exception" that the Supreme Court created in *Martinez* does not apply, and Aguallo cannot establish cause for his default of the trial error claims.  (For this reason, this Court has no occasion to address in this case the extent to which *Martinez* might apply in Illinois.)

### 3.     Miscarriage of justice

Aguallo contends that, even if he cannot show cause and prejudice for his default of these two claims, the Court should excuse the default because he can demonstrate

his actual innocence of the crimes for which he was convicted. "[A] convincing showing of actual innocence enable[s] habeas petitioners to overcome a procedural bar to consideration of the merits of their constitutional claims." *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013). "[A]n absolute certainty about a petitioner's guilt or innocence is not required to satisfy the petitioner's burden at the gateway stage." *Coleman v. Hardy*, 628 F.3d 314, 319 (7th Cir. 2010). Rather, the petitioner must show "that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). This is known as the "fundamental miscarriage of justice exception." *Herrera v. Collins*, 506 U.S. 390, 404 (1993).

Aguallo argues that the sworn statements of Judy and Rosellen Zawadzki demonstrate that Dominga Martinez "lied concerning her testimony that she was with [the Zawadzkis] direction prior to the shooting." Repl. at 9. Had these statements been in evidence at his trial, Aguallo says, "a reasonable jury may very well [have found] they discredit [Martinez] and return[ed] a different verdict." *Id.* He further argues that Tanya Zawadzki's testimony would have a similar effect, as she "testified on the difficulty she had in viewing the intersection at 32nd and Morgan," which would "cast doubt on Martinez's identification of Petitioner since they both were at the same vantage point and distance, and the poor lighting conditions." *Id.* Respondent contends that Judy and Rosellen Zawadzki's testimony would not have reflected on Aguallo's guilt or innocence but rather would have served only as additional impeachment evidence against Martinez, to the effect that she was not actually with them before the shooting as she claimed. Respondent also argues that Tanya Zawadzki's testimony would not have cast

doubt on Martinez's observations, as the two women viewed the shooting from different vantage points.

The evidence Aguallo cites is insufficient to show a likelihood that "no reasonable juror" would have found him guilty. The bulk of Judy and Rosellen's testimony involved events that occurred before and after the shooting, not during it. They did not testify that someone other than Aguallo did the shooting or even that Martinez herself did not see the shooting. And as the state trial court pointed out in its decision on Aguallo's post-conviction petition, the testimony was not entirely inconsistent with Martinez's account; it "corroborates the fact that [Martinez] was there, she was outside, and that she was yelling she knew who did it, and that she was talking to the police." Ex. W at 62. Consideration of this evidence would not make it more likely than not that no reasonable juror would have found Aguallo guilty.

Aguallo incorrectly characterizes Tanya Zawadzki's testimony on her observation of the shooting. Although Aguallo does not argue that Tanya was closer to the shooting than Martinez, he does say that Tanya and Dominga Martinez "both were at the same vantage point and distance" from the shooting. Repl. at 9. That is incorrect. The two women described the location of the shooting differently, along with where they were when they saw it. Tanya testified that she was outside her home at 3232 South Morgan, which is near the corner of Morgan and 32nd Place, when she observed "a man coming to shoot" outside a store at 33rd and Morgan, one block south. (Aguallo contends that Tanya "testified on the difficulty she had in viewing the intersection at 32nd and Morgan," Repl. at 9, but her testimony was that the shooting occurred at 33rd.) Tanya further testified that she could not identify the shooter, as it was "too

dark." Ex. V at 26–29. Martinez, on the other hand, described the shooting as taking

place at 32nd Street and Morgan (not 33rd), which is one block north of 32nd Place and

Morgan; she said she saw "two guys running from around the corner [who] stood right

on the corner by my house." Ex. O at 72. Unlike Tanya, Martinez said she saw the

shooter with the aid of lighting from a nearby bank. Tanya, on the other hand, testified

that an obstruction could have blocked her view, "[m]aybe a fence," Ex. V at 32, but

Martinez cited no such obstruction from her vantage point, testifying instead that the

bank's lighting aided her vision.

For these reasons, it is difficult to imagine how Tanya's account would have

made it more likely than not that the jury would have rejected Martinez's testimony. At

most, these were differing accounts of a shooting on the same night around the same

time in question, but from different locations, and describing the location of the shooting

differently. Only one of the accounts—Martinez's—actually included a positive

identification of Aguallo as the shooter. The Court concludes that Aguallo has not

shown that no reasonable juror would have found him guilty based on the new evidence

discussed here. He therefore cannot overcome his procedural default with a

miscarriage of justice claim based upon his actual innocence.

**B.      Ineffective assistance of counsel at trial**

Aguallo next argues that his counsel at trial was ineffective on seven different

grounds. These include trial counsel's failure to (1) preserve his objections to the

prosecutor's impeachment of defense witnesses; (2) move to suppress as suggestive

Martinez's identification of Aguallo; (3) permit Aguallo to testify at the pre-trial

suppression hearing; (4) interview Martinez before trial and potentially secure a

recantation from her; (5) investigate the scene of the shooting and challenge Martinez's ability to see the shooter; and (6) locate Judy, Rosellen, and Tanya Zawadzki and call them as witnesses at trial to impeach Martinez. Finally, Aguallo argues that all of his trial counsel's errors taken together constitute a separate basis for a claim of ineffective assistance of counsel.

An ineffective assistance of counsel claim requires a showing that "counsel's performance was deficient, meaning it fell below an 'objective standard of reasonableness' informed by 'prevailing professional norms,'" and that "counsel's deficient performance prejudiced [the defendant], meaning that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *McElvaney v. Pollard*, No. 12-2357, 2013 WL 4423669, at *3 (7th Cir. Aug. 20, 2013) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)). When assessing an attorney's performance, "courts must defer to any strategic decision the lawyer made that falls within the 'wide range of reasonable professional assistance,' even if that strategy was ultimately unsuccessful." *Shaw v. Wilson*, 721 F.3d 908, 914 (7th Cir. 2013) (quoting *Strickland*, 466 U.S. at 689). A showing of deficient performance must be accompanied by a showing of prejudice, where "a defendant must do more than show that his attorney's conduct had 'some conceivable effect on the outcome.'" *Brady v. Pfister*, 711 F.3d 818, 823 (7th Cir. 2013) (quoting *Strickland*, 466 U.S. at 693). The Court will analyze each of Aguallo's claims of ineffective assistance of trial counsel in turn.

### 1. Failure to preserve objection to impeachment of defense witnesses and argue suggestive show-up procedure

Aguallo contends that his trial counsel "should have objected to the prosecutor's improper impeachment of the three (3) key defense witnesses with their prior silence without establishing the proper grounds."  Pet. at 6.  He further argues that counsel should have filed a motion to suppress Martinez's identification of Aguallo, because "Martinez's identification was based on a suggestive show-up."  *Id.*  Respondent groups these claims together and argues that both are procedurally defaulted, because Aguallo did not assert the claims in his appeal from the denial of his post-conviction petition or in his PLA to the Illinois Supreme Court.  "[I]n the state appellate and supreme courts petitioner challenged neither the failure to preserve a wrongful-impeachment claim nor the failure to challenge Martinez's identification as a product of a suggestive show-up."  Ans. at 24 (citing Aguallo's post-conviction briefs).  Aguallo responds that respondent's argument is "totally incorrect . . . because he did raise [both issues] in his <u>pro se</u> petition for leave to appeal ('PLA')."  Repl. at 12.

Respondent is correct that Aguallo did not raise these ineffective assistance claims in his post-conviction appeal briefs.  Even if Aguallo raised the claim in a *pro se* PLA on post-conviction review, that does not eliminate the default that occurred by his failure to assert the claim before the Illinois Appellate Court.  A habeas corpus petitioner is required to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

As with his two defaulted unfair trial/due process claims, Aguallo again argues that he can show cause for the default via post-conviction counsel's deficient

performance, citing *Martinez*, 132 S. Ct. at 1319–20.  He says it is "obvious" that "post-conviction counsel failed to present the claim of appellate counsel's failure to raise the issue of trial counsel's ineffectiveness for not preserving the wrongful impeachment theory by objecting to it."  Repl. at 13.  The Court has already addressed a similar argument.  In this case, ineffective assistance of post-conviction counsel is not a basis to excuse the default of the claim of ineffective assistance of trial counsel, and *Martinez* does not provide a way around this for Aguallo.  The evidence supporting a claim of ineffective assistance by trial counsel for failure to argue suggestiveness was in the trial record, and thus the issue could have been raised on appeal.  Specifically, Martinez testified that police brought her to the station, where "[t]hey put a spotlight on [Aguallo] and asked me if it was him and I told them yes it was."  Ex. O at 78.

Respondent is also correct that Aguallo did not raise in his post-conviction petition the claim of ineffective assistance of trial counsel for failure to preserve an objection to the prosecutor's impeachment of defense witnesses.  Aguallo did, however, make this argument on both direct appeal and in his direct appeal PLA.  In his direct appeal brief, Aguallo argued ineffective assistance of trial counsel as an alternate ground for review of his trial error claim on improper impeachment.  He labeled the argument ineffective assistance of counsel and contended that "no reasonable strategy would have included a decision to permit the State to improperly impeach the defense's key evidence in a closely-balanced case."  Ex. B at 21.  Counsel's conduct prejudiced him, Aguallo argued, because the prosecutor "improperly impeached the otherwise credible challenges the defense presented to the State's evidence."  *Id.*  The Illinois Appellate Court did not address this argument, instead deciding that the underlying trial

error issue was waived and that the impeachment was not plain error.  In Aguallo's *pro se* PLA on direct appeal, he asserted three claims: that (1) he was denied a fair trial based on the prosecutor's closing statements to the effect that the voluntariness of Aguallo's confession had been decided as a matter of law; (2) he was denied a fair trial because the prosecutor improperly impeached the defense witnesses with their silence; and (3) his ninety-year sentence was excessive.  *See* Ex. E at 3.  At the end of Aguallo's discussion of the second ground listed above, Aguallo wrote: "Alternatively, this Court should review Mr. Aguallo's claim because trial counsel's failure to make the requisite objections to the prosecutor's actions amounted to ineffective assistance of counsel."  Ex. E at 11 (punctuation errors omitted).

The Court therefore concludes that Aguallo's argument that his trial counsel was ineffective for failing to object to the prosecutor's impeachment of three defense witnesses with their silence is not defaulted.  When a habeas corpus petitioner has not defaulted a claim for purposes of a habeas corpus petition, the Court is permitted to review the issue on the merits.  *McGee v. Bartow*, 593 F.3d 556, 567 (7th Cir. 2010). Because the state court did not review this issue on the merits, the review of this Court is *de novo*.  *Harris v. Thompson*, 698 F.3d 609, 639 (7th Cir. 2012).

The Court cannot conclude, however, that Aguallo has a viable ineffective assistance claim based on trial counsel's alleged failure to object to the impeachment. To begin with, trial counsel *did* object to the impeachment of one of the three witnesses. When the prosecutor asked defense witness Michael Sparacino if he had called the FBI to report exculpatory information about Aguallo, defense counsel objected, and the objection was overruled.  *See* Ex. P at 40.

But even if there had been no objection by trial counsel, Aguallo's ineffective assistance claim would lack merit. As the Seventh Circuit has noted, an "ineffective assistance claim based on a failure to object is tied to the admissibility of the underlying evidence." *Hough v. Anderson*, 272 F.3d 878, 898 (7th Cir. 2001). "If evidence admitted without objection was admissible, then the complained of action fails both prongs of the *Strickland* test: failing to object to admissible evidence cannot be a professionally 'unreasonable' action, nor can it prejudice the defendant against whom the evidence was admitted." *Id.* In other words, counsel's failure to object to evidence that was not admitted improperly cannot be proper grounds for an ineffective assistance of counsel claim. *United States v. Stark*, 507 F.3d 512, 521 (7th Cir. 2007).

In this case, the Illinois Appellate Court held that "there was no error, much less plain error" in the trial court's allowing the impeachment, Ex. A at 17, deciding that trial counsel's decision not to object to all of the impeachment did not prejudice Aguallo. This determination means, under *Hough* and *Stark*, that trial counsel's failure to object cannot have constituted ineffective assistance of counsel. The Court therefore rejects Aguallo's claim on the merits.

## 2. Failure to permit Aguallo to testify at suppression hearing

Aguallo next argues that his trial counsel should have called him to testify at the hearing on his motion to suppress his confession in order to show he did not voluntarily waive his *Miranda* rights before confessing. Specifically, Aguallo contends that he "did wish to testify" at the hearing, and that "the Appellate Court unreasonably concluded that Petitioner's testimony would not have rendered the Motion to Suppress Statements meritorious." Repl. at 15. Because Aguallo "did not fully understand English," he says,

29

his confession to police "was not voluntarily and intelligently given," and trial counsel's failure to "call Petitioner to substantiate" that fact constituted ineffective assistance.[1] *Id.*

Respondent argues that Aguallo's testimony would not have changed the outcome of the motion to suppress. Respondent points out that trial counsel testified at Aguallo's post-conviction hearing that Aguallo had no difficulty with English in preparations for trial, nor did Aguallo mention any such difficulty. Also, respondent argues that the expert's report that the circuit court ordered on post-conviction corroborated the view that Aguallo was able to understand the *Miranda* warnings at the time they were given.

In its decision on Aguallo's appeal on post-conviction, the appellate court upheld the circuit court's ruling that not calling Aguallo to testify at the suppression hearing did not amount to ineffective assistance of counsel. The appellate court observed that Marcus, Aguallo's trial counsel, "testified that he communicated with Aguallo solely in English and Aguallo participated in his defense." Ex. G at 18. It also noted that Marcus testified that Aguallo had said he did not want to testify at the hearing. Therefore, the court could not "conclude that trial counsel was deficient for failing to have Aguallo testify at the hearing." *Id.*

As an initial matter, it should be pointed out that Aguallo did present a witness at trial to testify about his English language ability. His sister, Martha Aguallo-Flores, testified that in 1998, Aguallo was able to read "[v]ery, very little" English. Ex. P at 15–16. Aguallo-Flores also testified on cross-examination that at the time of Aguallo's

---

[1] On post-conviction review, Aguallo also argued that his attorney was also deficient for failing to call Aguallo to testify about the conditions of his confession. However, he asserts only the English-language argument in his petition and reply here.

arrest, his English speaking skills were "not that good," although she also said she taught him reading by speaking English. *Id.* at 21–22.

As for the appellate court's decision on post-conviction review of Aguallo's case, its conclusion that Aguallo's trial counsel was not ineffective for not calling him to testify at trial about his limited English skills was not unreasonable, considering the available evidence. As attorney Marcus testified, he had no indication before Aguallo's trial that Aguallo could not speak or understand English; they two "spent hours" going "over virtually every word" of Aguallo's confession. Ex. V at 81. Client and counsel communicated in English, and what is more, Marcus testified that Aguallo told him he did not want to testify. Though Aguallo testified at post-conviction that he did in fact want to testify at trial, the circuit court's decision to credit Marcus's testimony over Aguallo's was not unreasonable. *See* 28 U.S.C. § 2254(d)(2) (allowing grant of habeas petition only if state court decision "was based on an unreasonable determination of the facts in light of the evidence presented"); *Burt v. Titlow*, No. 12–414, slip op. at 4–5 (U.S. Nov. 5, 2013) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." (citation omitted)).

Aguallo also argues that the appellate court unreasonably applied *Strickland*, because "[n]o where [sic] in the Illinois Appellate Court's decision does the Court use the correct standard in <u>Strickland</u> by stating whether the Petitioner showed that there is a 'Reasonable probability' that the proceedings on the suppression would have been different." Repl. at 17. Therefore, he says, the appellate court's "decision was contrary to clearly established federal law." *Id.*

Aguallo is incorrect. The appellate court used the "reasonable probability" language from *Strickland* multiple times in its decision. *See, e.g.*, Ex. G at 16 ("[I]n ineffective assistance claims, a defendant need only show a reasonable probability that the outcome would have been different."). The Court concludes that the appellate court employed the correct standard from *Strickland* in evaluating this claim.

### 3. Failure to investigate witness Martinez prior to trial

Next, Aguallo claims that his trial counsel's "[f]ailure to secure a pre-trial recantation from Martinez" was constitutionally inadequate representation. Repl. at 17. The basis for his claim is the post-conviction testimony of investigator Swanson; Aguallo claims that Swanson "obtained the recantation from" Martinez post-trial, *id.* at 18, and therefore Marcus would have done the same had he interviewed Martinez before trial. "Such [a] recantation would obviously completely discredit Martinez's statement / identification against Petitioner and there is a reasonable probability that the outcome at trial would have been different." *Id.* at 19.

Respondent counters that there is "scant support in the record" for this claim. Ans. at 28. First, respondent observes that Martinez was impeached with the testimony of three defense witnesses at trial, each of whom claimed that Martinez recanted. Second, respondent argues that "Martinez's (alleged) eventual recantation to investigator Swanson—which she refused to support with an affidavit or testimony at the postconviction hearing—provides only minimal support for the proposition that she would have recanted years earlier." *Id.*

The appellate court concluded on post-conviction review that Aguallo's argument about Martinez's potential recantation upon a pre-trial interview by attorney Marcus was

"mere speculation." Ex. G at 18. It pointed out that Swanson's affidavits were "problematic," as Martinez did not sign either of them, and "because the key detail that Martinez was not able to identify the shooter was only added to the statement after Swanson spoke with Aguallo's attorney." *Id.* at 19. In addition, the appellate court concluded that even a concrete recantation by Martinez to Swanson did not necessarily mean she would have recanted prior to trial.

The appellate court's decision on this point was not an unreasonable application of *Strickland.* Reasonable jurists could conclude that it was speculative that a pretrial interview of Martinez by attorney Marcus would have yielded a recantation. It should be noted that Martinez has never recanted her identification of Aguallo as the shooter on any kind of record. Though Swanson testified that Martinez told him she could not identify the shooter, she refused to sign any statement to that effect, and she would not verify anything she told Swanson in their conversation when she testified at Aguallo's post-conviction hearing. Considering all the evidence, the appellate court's decision on this claim was a reasonable application of federal law for purposes of section 2254(d).

### 4.    Failure to investigate the scene of the crime and challenge Martinez

Aguallo also contends that his trial counsel "failed to investigate the scene of the shooting." Pet. at 8. In his reply, he expands this argument to include his attorney's failure to "challenge Martinez's ability to see the shooter." Repl. at 20. Such an investigation, Aguallo argues, "would have produced evidence to challenge Martinez's ability to see the shooter," and it "would have been fruitful as to the distance (measurement) where she stood, lighting at that time of the day (photographs); and vantage point." *Id.* at 20–21. Had trial counsel put the fruits of such an investigation

into evidence, Aguallo contends, it "would have shown the jury that Martinez's identification was not wholly reliable." *Id.* at 21.

Respondent argues that the jury already learned during Martinez's cross-examination about her difficulty with the directions of streets and with street names in her neighborhood, which she cleared up on redirect examination. Respondent also argues that investigator Swanson's measurements from Martinez's house to the scene of the shooting, which showed the distance to be about 100 to 130 more feet than Martinez estimated, showed nothing more than that "Martinez, like most people, was unskilled at eyeballing distances." Ans. at 30. As an alternative argument, respondent contends that not challenging Martinez's identification abilities "was strategically sound." *Id.* at 31. Because the defense theory was that Martinez saw someone else do the shooting and told defense witnesses about it, the defense actually depended on Martinez's ability to see the shooter.

To begin with, and as the appellate court pointed out on post-conviction review, Aguallo's trial counsel did visit and investigate the crime scene. Marcus testified at Aguallo's post-conviction hearing that he went to the scene and took photographs, though he did not present them at trial because the pictures "weren't particularly helpful to the defendant." Ex. V at 80. The Court will thus focus on the related argument that Marcus failed to challenge Martinez with information that he gleaned from visiting the scene or other investigations. As the appellate court noted, there was already evidence on record at trial that Martinez had difficulty with directions and street names when she testified. The jury had knowledge of her trouble with distances without additional evidence that might have been derived from Marcus's observations of the crime scene.

On the other hand, the jury had also heard evidence that Martinez on multiple occasions identified Aguallo, whom she had known for a decade, as the shooter she saw in the lights of a nearby bank.

The state appellate court decided that discrepancies in distances that Martinez reported in her testimony could not show "a probability sufficient to undermine confidence in the outcome of the trial," and thus that Aguallo was not prejudiced by trial counsel's actions on this issue.  Ex. G at 23.  That conclusion was not contrary to or an unreasonable application of federal law.  The Court therefore need not address whether Marcus's inaction amounted to unreasonably deficient performance.

**5.    Failure to locate and interview Zawadzkis and impeach Martinez with their testimony**

Aguallo argues that Marcus should have found the three members of the Zawadzki family (Judy, Rosellen, and Tanya) and called them as witnesses at trial to impeach Martinez with their observations from the night of the shooting.  Martinez's testimony, he contends, "was contradicted by two witnesses who counsel never talked to," Repl. at 22—namely, Judy and Rosellen, both of whom testified at Aguallo's post-conviction hearing that they were not with Martinez before the shooting.

As above, the Court need not address respondent's contention that it was sound trial strategy not to locate and interview members of the Zawadzki family.  Rather, the Court reiterates its conclusion, echoed above in discussing Aguallo's actual innocence claim, that his attorney's failure to find the Zawadzkis and call them to the stand to testify did not prejudice him.  Though Aguallo contends that Judy and Rosellen Zawadzki would have contradicted Martinez's testimony, they would have done so, if at all, only on the issue of who Martinez was with immediately before the shooting.

Neither Judy nor Rosellen themselves actually saw the shooting. Aguallo also repeats his argument here that Tanya Zawadzki's account of the shooting would have helped challenge Martinez's testimony of her distance from and ability to view the shooter. As discussed above, Tanya and Martinez viewed the incident from different vantage points, and Tanya testified that her angle on the shooter was darkened, and possibly obstructed by a fence. Though Aguallo contends "the result would have been different" at trial if the Zawadzkis testified, he fails to explain persuasively how their testimony would have bolstered his defense beyond the evidence already presented in the case. The Court therefore concludes that the appellate court's decision on this claim was not unreasonable.

### 6. Cumulative ineffective assistance of trial counsel

In his final argument on the actions of his trial counsel, Aguallo contends that "cumulatively the errors trial counsel committed were too damaging and clearly qualifies [sic] as a denial of the 6th Amendment right to effective assistance of counsel." Pet. at 8. In making this argument, Aguallo largely reiterates the basics of each of the six trial counsel claims outlined above and argues they should be received *de novo*, as they "present mixed questions of law and fact and no deference can be necessarily made to the State Appellate Court decision." Repl. at 25. In his answer, respondent points out several instances of trial counsel's actions that respondent argues were "not deficient," including the fact that he "highlighted the circumstances of petitioner's confession, demonstrated Martinez's difficulty with details, and presented three witnesses who testified that Martinez admitted framing petitioner." Ans. at 34. Respondent also argues

that any cumulative trial counsel deficiency did not prejudice Aguallo, because the errors Aguallo alleges, if corrected, would not have changed the outcome of the trial.

It is possible for several errors of trial counsel that are not individually prejudicial to constitute a "pattern of ineffective assistance" under *Strickland*. *Goodman v. Bertrand*, 467 F.3d 1022, 1030 (7th Cir. 2006). "Although a specific error, standing alone, may be insufficient to undermine the court's confidence in the outcome, multiple errors together may be sufficient." *Hough*, 272 F.3d at 891 n.3.

As discussed earlier, some of Aguallo's claims of ineffective assistance of counsel were defaulted, and on some of his claims, the state courts reasonably found that counsel's conduct was not deficient. As to the remaining claims, on which the state courts' findings were premised on the absence of prejudice,[2] the cumulative effect is insufficient to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

## C.    Ineffective assistance of counsel on direct appeal

Finally, Aguallo argues that his counsel on direct appeal should have challenged the admission of evidence that Martinez was threatened by a member of the same gang to which Aguallo belonged.[3] He argues that "[b]y allowing Dominga Martinez to testify to inflammatory allegations without challenging the validity of her testimony was an

---

[2] These claims are the failure to interview the Zawadzkis and call them as witnesses, the failure to try to secure a pretrial recantation from Martinez, and the failure to impeach Martinez regarding her observation of the crime scene.

[3] In his reply, Aguallo also lists nine additional claims of ineffective assistance of appellate counsel. See Repl. at 26–27. However, though it is unclear, he appears to set aside discussion of any of those claims after enumerating them and returns solely to discussing the threat testimony from Martinez. The Court will therefore not evaluate these added claims. Furthermore, most of the claims are reiterations of points that the Court has already discussed above.

issue [sic] Appellate Counsel should have raised in Petitioner's first appeal as of right."
Pet. at 6. Aguallo contends that an argument on Martinez's mention of gang threats in
her testimony "would have succeeded on appeal," and therefore appellate counsel's
exclusion of the issue was prejudicial to Aguallo. Repl. at 29. Respondent, on the other
hand, argues that the appellate court's decision on post-conviction review of this issue
was reasonable. Its conclusions, respondent says, rested on state evidentiary law and
"should not be second-guessed in federal court." Ans. at 36.

As noted earlier, an "ineffective assistance claim based on a failure to object is
tied to the admissibility of the underlying evidence." *Hough*, 272 F.3d at 898. The
failure to object to evidence that was not improperly admitted cannot be proper grounds
for an ineffective assistance of counsel claim. *Stark*, 507 F.3d at 521.

In this case, the state appellate court on post-conviction review analyzed the
issue of the threat testimony on evidentiary grounds. The court noted that the decisions
of trial courts admitting gang-related evidence "will not be reversed absent a clear
abuse of discretion." Ex. G at 24 (citing *People v. Williams*, 147 Ill. 2d 173, 224,
588 N.E.2d 983, 1002 (1991); *People v. Gonzalez*, 265 Ill. App. 3d 315, 326,
637 N.E.2d 1135, 1143–44 (1994)). Considering the trial court's allowance of a limited
inquiry into Martinez's demeanor, and that "[n]o testimony regarding the actual threat
was allowed," the appellate court concluded that admission of the evidence was not an
abuse of discretion. *Id.* at 24–25. Given the fact that the underlying evidence at issue
here was admissible as a matter of state evidence law, appellate counsel's failure to
include the issue on direct appeal was not ineffective assistance. The Court concludes

that the appellate court's decision—that "it was not objectively unreasonable for appellate counsel not to raise this issue on direct appeal," *id.*—was reasonable.

**D.     Certificate of appealability**

When a district court enters a final judgment that dismisses a prisoner's habeas corpus petition, it must issue or deny a certificate of appealability (COA).  "[F]ederal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners" in the absence of a COA.  *Miller–El v. Cockrell*, 537 U.S. 322, 336 (2003). To obtain a COA, the petitioner must make "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  A court should issue a COA if it determines that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted).  When a district court denies a claim on procedural grounds, the petitioner must show both that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id.*

The Court's determinations that review of certain of Aguallo's claims is barred by procedural default, that the state courts reasonably adjudicated other claims, and that one of the claims is meritless are not fairly debatable. The Court therefore declines to issue a certificate of appealability.

**Conclusion**

For the foregoing reasons, the Court denies Aguallo's petition for a writ of habeas corpus [docket no. 1] and directs the Clerk to enter judgment in favor of the respondent. The Court also declines to issue a certificate of appealability.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  November 12, 2013